| | | |
|---|---|---|
| **DEBRA POTTS, KIMBERLY HUNT, and** | ) | |
| **MERRITT CHAPLIN, Individually and on** | ) | |
| **behalf of all others similarly situated,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 3:14-cv-1412** |
| | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **NASHVILLE LIMO & TRANSPORT, LLC,** | ) | |
| **JOSHUA M. LEMAY, and TRACY** | ) | |
| **MCMURTRY,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JOSHUA M. LEMAY and NASHVILLE** | ) | |
| **LIMO & TRANSPORT, LLC,** | ) | |
| | ) | |
| **Cross-Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **TRACY MCMURTRY** | ) | |
| | ) | |
| **Cross-Defendant.** | ) | |

## CORRECTED MEMORANDUM

The plaintiffs in this conditional class action have filed a Motion to Re-Open the Notice Period and to Invalidate Releases (the "Motion") (Docket No. 75), to which the defendants have filed Responses in Opposition (Docket Nos. 81, 82), and the plaintiffs have filed a Reply (Docket No. 91). After the briefings were filed, the court ordered an evidentiary hearing on the Motion (Docket No. 93), which was held on March 31, 2016. For the following reasons, the Motion will be granted in part and denied in part.

## BACKGROUND

The three named plaintiffs – Debra Potts, Kimberly Hunt, and Merritt Chaplin – are former employees of the defendant Nashville Limo & Transport, LLC ("NL&T"), a company that transports vehicles for various auctions and dealerships around Nashville, Tennessee. NL&T was owned by the defendant Tracy McMurtry until March 1, 2013, when the company's assets were transferred to the ownership of the defendant Joshua LeMay, who has operated NL&T ever since.[1]  The named plaintiffs filed this action pursuant to § 216(b) of the Fair Labor Standards Act ("FLSA") on behalf of themselves and other current and former employees of the defendants.  (Docket No. 22.)  The plaintiffs allege that the defendants have failed to pay them all compensation rightly owed, including minimum wage for all hours worked and overtime pay for hours worked over 40 hours per week, as well as liquidated damages and attorney's fees.  (*Id.* at p. 10.)

On July 10, 2015, the court approved conditional class certification for a class consisting of all individuals who were employed by NL&T during the three-year period from July 1, 2011 to July 1, 2014.  (Docket Nos. 50, 51.)  On August 4, 2015, the court granted the plaintiffs' Motion to Approve Notice for Collective Action (Docket No. 56) and ordered that the plaintiffs' proposed notice (the "Notice") be sent to putative class members and posted in the defendants' place of business.  (Docket No. 57.)  The Notice described the plaintiffs' claims briefly:

> In this case, the Plaintiffs claim they and other workers were not paid for time being transported, time they were required to wait in the office, and other time spent working "off the clock"; as a result, the Plaintiffs claim they were not paid overtime and/or minimum wage in violation of the [FLSA].

---

[1] Before March 1, 2013 – while it was owned by Mr. McMurtry – NL&T was officially named Nashville Limo Bus, LLC.  It appears, however, that the business operated under the name of "Nashville Limo & Transport" during that time.  The court will, therefore, use NL&T to refer to both Nashville Limo & Transport, LLC and Nashville Limo Bus, LLC.

(Docket No. 56-1.)  The Notice contains no further description of the claims, and it does not outline for class members the recovery to which they may be entitled.  (*See id.*)  The Notice also contains the following language, bolded and underlined, concerning communication between putative class members and the defendants:

> **If you join the lawsuit by returning the consent form, you should not discuss this case (including your decision to join this case) with the Defendants' owners and management, or their attorneys, without your counsel present.**

(*Id.*)  The court provided a notice period of 60 days for potential class members to join the suit (Docket No. 50) and, from August 21, 2015 to October 13, 2015, twenty-two putative class members consented to join (Docket Nos. 58–68).[2]  Despite the fact that there appear to have been thirty-eight potential class members working at NL&T shortly before the notice period opened (*see* Docket No. 76-3 (NL&T Driver Info)), only one such present employee consented to join the suit: Mazzio Chumney.  The remainder of the twenty-two opt-in class members are comprised of individuals no longer employed by NL&T.

On December 7, 2015, approximately one month after the notice period closed, the plaintiffs filed the pending Motion.  (Docket No. 75.)  In the accompanying Memorandum, the plaintiffs allege that the individual defendants – Mr. LeMay and Mr. McMurtry – improperly contacted, and attempted to settle with, both opt-in and named class members during and after the notice period.  (Docket No. 76.)  As a result, the plaintiffs argue, some opt-in class members sought to release their claims against the defendants and be removed from the suit.  (*Id.*)  At the time the Motion was filed, counsel for the plaintiffs was aware of only two opt-in class members

---

[2] Counsel for the plaintiffs received consent forms from John M. Thomas, Reva Gross, Donta Yarbro, Mazzio Chumney, Christa Webster, Richard Sullivan, Gerald Lee Lilly, Marcus McCarroll, Kizzy Owens, Shaneca Reed-Rivers, Michael Boyd, Dwight James, Ronnie Chrismon, Da'Shaun Williamson, Kenneth Neal, Ulina Holt, Amanda Beasley, Benjamin J. Ramos, Efrain V. Ramos, Erin Johnson, Jarvis Clemmons, and Georgetta Pitts.

– Dwight James, a former employee, and Mr. Chumney, a current employee – who had signed release forms given to them by the defendants and requested removal from the suit. (*Id.* at pp. 2–3.) The plaintiffs were also aware that Mr. LeMay and Mr. McMurtry had contacted two of the named plaintiffs, Debra Potts and Kimberly Hunt, and opt-in class member Ulina Holt by phone in November of 2015 to discuss settling their claims, though these conversations did not result in any agreement. (*Id.* at pp. 4–6.) During these phone calls, the plaintiffs allege that the defendants (1) made false statements about having already settled with other class members and (2) failed to describe the relief to which the plaintiffs may be entitled under the FLSA if they proceeded with their claims. (*Id.*) As evidence of these calls, the plaintiffs submitted declarations from Ms. Potts, Ms. Hunt, and Ms. Holt, along with audio recordings of voicemail messages left by Mr. McMurtry for Ms. Hunt. (Docket Nos. 76-7–76-9, 80.)

Relying on this evidence, the plaintiffs argue that Mr. LeMay and Mr. McMurtry made statements that are misleading and coercive and, therefore, constitute an improper attempt to undermine the purposes of the collective action and the court's authority to oversee and manage the litigation. (Docket No. 76.) The plaintiffs, therefore, assert that the court should exercise its broad authority in managing § 216(b) actions to remedy the harm done by the defendants' improper communications. (*Id.* at pp. 12–14, 20–22.) Finally, the plaintiffs argue that the release agreements are invalid as a matter of law, because an employee may not settle his claims under the FLSA without the supervision of the Secretary of Labor or a district court. (*Id.* at p. 17.)

The plaintiffs request multiple remedial actions from the court. The parties have already agreed to, and the court has approved and entered, a protective order forbidding the defendants from "initiat[ing] any communications with named Plaintiffs, any class member, or putative

Plaintiffs regarding the subject matter of this litigation until further Order of this Court." (Docket No. 74.)  The plaintiffs argue, however, that "simply prohibiting any future communication does not remedy the harm that has already occurred as a result of the Defendants' actions," and they request that the court also (1) reopen the notice period to potential class members, (2) invalidate the releases signed by class members and all accompanying documentation (including signed affidavits), (3) levy a fine against Mr. LeMay and Mr. McMurtry, (4) toll the statute of limitations to the last date of the original notice period for the claims of any putative class members who have not yet opted into the suit, (5) require the defendants to produce copies of any release signed by any actual or potential class member, and (6) require the defendants to pay reasonable attorney's fees and costs for this motion.  (Docket No. 76, pp. 20–22.)

Both Mr. LeMay and Mr. McMurtry filed Responses in Opposition to the Motion, acknowledging that they had, in fact, approached opt-in class members in an attempt to settle their claims.  (Docket Nos. 81, 82.)  The defendants assert, however, that they only contacted these class members after they had learned that some "plaintiffs to this litigation were unaware of their role in the litigation or otherwise desired to opt-out of the lawsuit."  (Docket No. 81, p. 3 (LeMay); *accord* Docket No. 82, p. 5 (McMurtry).)  Furthermore, the defendants argue that their discussions with class members were expressly authorized by the Tennessee Rules of Professional Conduct, were not prohibited by the plain language of the Notice, and did not undermine the class action or the court's oversight because they were not misleading, coercive, or otherwise improper.  (*See* Docket Nos. 81, pp. 7–14; Docket No. 82, pp. 10–20.)

In support of their Responses, Mr. LeMay and Mr. McMurtry submit evidence

demonstrating that they contacted, and settled with, thirteen opt-in class members.[3] (Docket No. 81-1; Docket Nos. 82-1–82-2.) The defendants attach to their Responses evidence of their settlement with some of the class members, including (1) for each settling class member, documentary evidence consisting of a release agreement, an affidavit, and a signed statement that the class member wishes to opt out of the suit; and (2) video and audio recordings of portions of the defendants' conversations regarding the release agreements with Ms. Holt and with all settling class members other than Michael Boyd, Dwight James, and Donta Yarbro. (Docket Nos. 81-1, 82-1, 82-2, 87, 88, 105.) The documentation reflects that Mr. LeMay reached settlement agreements with the following class members for the following amounts:

1.  Mazzio Chumney, $50

2.  Reva Gross, $100

3.  Dwight James, $200

4.  Gerald Lilly, $200

5.  Donta Yarbro, $200

(Docket No. 81-1.) Mr. McMurtry reached settlement agreements with the following class members for the following amounts:

1.  Michael Boyd, $100

---

[3] The plaintiffs claim that they did not know the number of the class members who had signed releases with the defendants, or their identities, until the defendants filed their Responses to the Motion. (Docket No. 91, p. 1.) It appears from the record that the parties have been engaged in a dispute over production of the releases since November of 2015. (*See* Docket No. 77-5 (Nov. 19, 2015 Emails).) The defendants have taken the position that the releases are not responsive to any discovery request that has been sent by the plaintiffs (Docket No. 81, p. 5), and the plaintiffs have taken the position that (1) they had clarified a prior discovery request to include these releases and (2) the defendants falsely represented that they had no such releases in their possession as of November of 2015 (Docket No. 76, p. 8). As discussed below, the court will order the defendants to produce these records to the plaintiffs.

2.      Ronnie Chrismon, $200

3.      Dwight James, $200

4.      Marcus McCarroll, $1000

5.      Kenneth Neal, $200

6.      Benjamin Ramos, $400

7.      Efrain Ramos, $400

8.      John Thomas, $500

9.      Christa Webster, $1000

(Docket No. 82-2.)  As indicated above, Mr. James was the only class member to sign separate release agreements with Mr. LeMay and Mr. McMurtry, and he received a total payment of $400 as a result ($200 from each defendant).

On January 8, 2016, the plaintiffs filed a Reply in support of the Motion, arguing that the video and audio recordings submitted by the defendants demonstrate that both Mr. McMurtry and Mr. LeMay coerced and misled class members during their discussions regarding the proposed release agreements.  (Docket No. 91.)  On February 29, 2016, after reviewing the record – including the video and audio recordings submitted by the defendants – and holding a telephone conference with the parties, the court ordered an evidentiary hearing and nullified a confidentiality provision found in the release agreements so that no penalty could be levied against class members who were called to testify.  (Docket No. 93.)  After the court granted Mr. McMurtry's request for a continuance, the hearing was set for March 31, 2016.  (Docket Nos. 94, 96.)

On March 29, 2016, two days before the hearing, Mr. LeMay filed a motion to manually file a second video recording of a portion of his conversation with class member Mazzio

Chumney that had not been submitted to the court with Mr. LeMay's Response. (Docket No. 104.) According to Mr. LeMay's counsel, the recording was not submitted with Mr. LeMay's Response because "Mr. LeMay mistakenly thought this supplement had been provided to counsel and subsequently to the parties and this Court." (*Id.* ¶ 2.) The court granted Mr. LeMay's request, and a disc containing the video recording was delivered to chambers on March 30, 2016, the day before the evidentiary hearing. (Docket No. 107.)

On March 31, 2016, the court held a hearing on the Motion and heard evidence from both the plaintiffs and the defendants. The plaintiffs called as witnesses three opt-in class members who had settled their claims – Christa Webster, Marcus McCarroll, and Dwight James – and one named class member who had refused to settle with Mr. McMurtry – Kimberly Hunt. (Docket No. 108.) The plaintiffs also intended to call Mr. Chumney, but he did not appear.[4] The defense called as witnesses the individual defendants – Mr. LeMay and Mr. McMurtry – and Jan Miles, a notary public who had been the Controller of NL&T before it was sold to Mr. LeMay and who accompanied Mr. McMurtry during many of his settlement discussions with class members. (*Id.*) At the close of the hearing, counsel for all parties presented final arguments regarding the propriety of the defendants' conduct and the plaintiffs' requested remedial action, and the court took the Motion under advisement.

## FINDINGS OF FACT

Based on the testimony presented and the arguments made during the March 31, 2016 evidentiary hearing, and upon review of the record, including the video and audio recordings

---

[4] Counsel for the plaintiffs represented during the hearing that they sent the subpoena to Mr. Chumney by certified mail and had been attempting to contact him by email and phone to no avail. The court asked counsel for the plaintiffs if they wished for the court to hold Mr. Chumney in contempt, but counsel for the plaintiffs has yet to file anything indicating that they do.

submitted by the defendants,[5] the court makes the following findings of fact regarding the settling class members' agreements to release the defendants from liability for the claims against them and the discussions between the defendants and class members regarding those agreements.

## I.    Documentation of the Release Agreements

Each of the settling class members executed the following documentation when they agreed to release their claims: a release agreement, an affidavit supporting that agreement, and a hand-written statement that the class member wished to opt out of the lawsuit.  The release agreements provide that, in consideration for a sum of money, the signing class member "releases and forever discharges" one of the individual defendants – either Mr. LeMay or Mr. McMurtry – "and any present or former owners, agents, employees, officers, directors, consultants, or successors of [NL&T], and any affiliate corporations, parents, subsidiaries, business entities, and insurers of [NL&T]" from the following:

> [A]ny and all legal responsibilities, claims, rights of action, causes of action, suits, liabilities, demands, damages (including liquidated damages under the [FLSA] or otherwise), costs, attorneys' fees, expenses and compensation that were asserted or brought, by the Plaintiffs under the FLSA, the Tennessee Whistleblower Act, Tennessee's retaliatory theory, or any state labor and employment law in a Collective Action, alleging unlawful termination or any failure to properly pay overtime or to properly compensate employees for all hours worked, which includes any claims the Plaintiffs could have or did allege for damages or unpaid wages pursuant to 29 U.S.C. Section 216(d) for "liquidated damages," and unpaid wages for a "willful violation" of the FLSA, as that term is defined in 29 U.S.C. Section 255(a).

(*See, e.g.*, Docket No. 81-1, p. 11 (LeMay); Docket No. 82-2, p. 2 (McMurtry).)  The release agreements further require that the signing class member will keep the terms confidential, stating:

---

[5] Some of the recordings are of poor audio quality, and it can be difficult to discern exactly what is said.  Quotations from these recordings, therefore, reflect the court's best interpretation of the statements that were made.

> Both parties agree that the terms of this Agreement and Release will remain confidential by [the signing class member] and will not be revealed to anyone else whatsoever (except tax preparer or attorney who shall be bound by this confidentiality provision) unless under subpoena or court order. This provision is an essential and material term of the Agreement and if [the signing class member] breaches said Agreement [NL&T] and [Mr. LeMay or Mr. McMurtry] shall be entitled to recover $5000 (Five Thousand Dollars) as liquidated damages from [the signing class member] for such material breach, plus attorneys' fees and costs should they be required to pursue legal action for the breach.

(*See, e.g.*, Docket No. 81-1, p. 12 (LeMay); Docket No. 82-2, p. 4 (McMurtry).)

The affidavits accompanying the release agreements, which are typewritten and appear to have been prepared in advance by the defendants, state that the signing class members "make oath and affirm" as follows:

1. I am voluntarily signing this Affidavit and the Agreement and Release dated [with the date of signing] and was not coerced into signing this Affidavit or the Agreement and Release. The statements made herein are true and accurate to the best of my knowledge.

2. I was fairly compensated for all time that I worked for [NL&T], including wages that were equal to or greater than minimum wage.

3. I did not routinely work more than 40 hours per week for [NL&T]. For any week that I did work more than 40 hours per week, I was fairly compensated with overtime pay at a rate of time and a half.

4. In calculating my wages for both minimum wage and overtime, I have taken into account all time spent working for [NL&T], from the moment that the van left [NL&T]'s headquarters to the time that it returned, including but not limited to time spent picking up and delivering cars, driving cars, waiting on other drivers or the van, and any "down time" other than breaks for meals.

(*See, e.g.*, Docket No. 81-1, p. 10 (LeMay); Docket No. 82-2, p. 3 (McMurtry).) The statements signed by each settling class member aver that he or she wished to opt out of the suit, and they were often dictated by the defendants and hand-written by the signing class member. (*See, e.g.*, Docket No. 81-1, p. 13 (LeMay); Docket No. 82-2, p. 1 (McMurtry).)

**II.**    **Settlement Discussions Between the Individual Defendants and Class Members**

      **A.**    **Settlement Discussions Between Mr. LeMay and Class Members**

Mr. LeMay obtained release agreements from five class members – Mazzio Chumney, Reva Gross, Dwight James, Gerald Lilly, and Donta Yarbro – and unsuccessfully attempted to settle the claims of opt-in class member Ulina Holt.  Mr. LeMay testified that he settled with class members because, although he maintains that there are no viable claims against him or NL&T under the FLSA, he wanted to avoid the expense of the litigation.

Mr. LeMay submitted audio recordings of his discussions with Ms. Gross and Mr. Lilly and two video recordings of his discussions with Mr. Chumney, and he testified that he has submitted all of the recordings that he has in his possession and that he has not altered them in any way.  It is clear from the recordings, however, that they capture only a portion of the discussions between Mr. LeMay and the class members with whom he spoke; some of the recordings begin in the middle of a conversation or end before a conversation has concluded and, in at least one instance, it is apparent that the recording was paused and then restarted in the middle of the conversation, excluding some of the dialogue.  (*See, e.g.*, Docket 87 (M. Chumney) (stating that the conversation in the recording is merely a "continuation" of a past conversation, which does not appear to have been recorded); *id.* (G. Lilly) (Mr. LeMay appears to turn off the recording device and to only turn it on again later in the conversation when Mr. Lilly says something that Mr. LeMay wishes to record); *id.* (R. Gross) (starting the recording in the middle of a question and ending midway through a sentence).)  Even though the recordings are incomplete, however, they – along with other evidence in the record and the testimony at the hearing – demonstrate that (1) the only class member to join the suit while still employed at NL&T experienced significant pressure to opt out, and (2) Mr. LeMay described the plaintiffs'

claims to class members in a way that was one-sided and misleading and did not adequately inform them of their right to speak to their own counsel before entering into an agreement.

### 1. *Mr. LeMay's conversations with current employee, Mr. Chumney*

Of the approximately forty potential class members who were working at NL&T shortly before the notice period opened, only one consented to join the suit. (*See* Docket No. 76-3 (NL&T Driver Info).) The plaintiffs, therefore, express "great concern" in the Motion that NL&T employees may have been discouraged or prevented from opting into the suit by Mr. LeMay or others at NL&T. (Docket No. 76, p. 17.) The relatively small number of current NL&T employees opting into the suit is indeed concerning, but the plaintiffs have submitted no additional evidence – either in the records or at the hearing – demonstrating that Mr. LeMay or anyone else at NL&T actually discouraged employees – or any potential class members – from joining the suit. There is, however, evidence suggesting that Mr. LeMay pressured Mr. Chumney, the only current employee to join the suit, to *opt out* of the class action after he had joined. For example, Mr. Chumney accepted only $50 to release all of his claims, which is far less than any other settling class member accepted. (Docket No. 81-1, pp. 14–17.) The fact that the only class member who was working for Mr. LeMay was also the class member to receive the smallest payment gives the court reason to suspect that Mr. Chumney was pressured into releasing his claims, a suspicion that is confirmed by Mr. LeMay's video recordings of his conversations with Mr. Chumney.

Mr. LeMay submitted two video recordings of his discussions with Mr. Chumney, both of which appear to have taken place in NL&T's office. In the recordings, Mr. Chumney appears uncomfortable, and he speaks quietly and directly into the recording device. In both recordings, Mr. LeMay appears to be prompting Mr. Chumney to state that he only consented to join the suit

because he believed that it was court-ordered and, therefore, mandatory.

In the first recording, which is only a minute and a half long, Mr. LeMay begins the discussion by stating: "we are continuing our conversation today." (Docket No. 87 (M. Chumney)). There is no evidence in the record, however, regarding the number, duration, or content of prior settlement conversations between Mr. LeMay and Mr. Chumney. Mr. Chumney first states that he signed the consent form opting into the suit because he believed it was "court-ordered." (*Id.*) Mr. Chumney then states that he is "thankful for whatever pay [he] can get," at which point Mr. LeMay interrupts Mr. Chumney to remind him that his statement is supposed to be that he was paid correctly and to admonish Mr. Chumney that they are both "grown men here." (*Id.*) After this interruption, Mr. Chumney again states that he signed the consent form because he believed it to be court-ordered, which apparently satisfies Mr. LeMay, and the recording ends. (*Id.*)

In the second recording, which lasts approximately four minutes, Mr. LeMay again attempts to elicit a statement from Mr. Chumney that he only signed the consent form because he thought a warrant would issue if he failed to do so. (Docket No. 105.) Shortly into the recording, Mr. Chumney receives, and answers, a call on his cell phone from his mother. (*Id.*) Mr. Chumney asks his mother to read the "court paper" to him, but when she cannot find it, he asks if he can come and get the paper so that he can show it to Mr. LeMay. (*Id.*) As the court noted at the hearing, what Mr. Chumney says next is troubling. Mr. Chumney tells his mother that "he" – apparently referring to Mr. LeMay – does not believe what Mr. Chumney is telling him about the consent form. (*Id.*) Looking up at the camera, Mr. Chumney states that he is "just thankful to have a job," and then adds: "I can't convince him, so I'm not working right now. I'm not working today – I wasn't on call Saturday – so I'm just really trying to keep my job."

(*Id.*)  Mr. LeMay does not correct Mr. Chumney or assure him that the hours he works are not

contingent upon his releasing his claims, and the recording ends shortly thereafter.[6]

### 2.    *Mr. LeMay's conversations with former employees*

The recordings of the conversations between Mr. LeMay and his former employees, and

the testimony presented at the hearing regarding those conversations, demonstrate that

Mr. LeMay made inaccurate and misleading statements regarding these plaintiffs' claims and

failed to adequately inform these class members of their right to speak to counsel before agreeing

to any release.

Mr. LeMay presented class members with an entirely one-sided view of the case.  In the

recordings, Mr. LeMay begins many of the release discussions by asking the class member to

describe his understanding of the suit and, when the class member is unable to adequately do so,[7]

Mr. LeMay presents the class member with a self-serving (and sometimes patently false)

description of the suit.  There is nothing in the recordings, or in Mr. LeMay's own testimony, to

suggest that Mr. LeMay ever gave any of the class members a copy of the Complaint or the

Notice to inform them of the plaintiffs' claims.  Rather, in the recordings, Mr. LeMay tells class

members that he can describe the suit to them, beginning with the fact that Ms. Potts filed the

suit out of spite after he let her go.  (Docket No. 87 (G. Lilly) (offering to "tell [Mr. Lilly] what

---

[6] Mr. LeMay testified at the hearing that he never threatened Mr. Chumney's
employment but, in light of the statements captured in the video recording and Mr. LeMay's
failure to correct those statements when they were made, the court does not find that testimony to
be credible.  Moreover, despite being subpoenaed by the plaintiffs to appear and testify at the
hearing, Mr. Chumney failed to appear.

[7] The court is not finding that the class members did not understand the basic allegations
of the suit when they consented to join.  Rather, the court is noting that, at the time that Mr.
LeMay discussed the possibility of a settlement with class members, they could not always recall
or articulate the contents of the Notice.

[the lawsuit] was" and stating that the suit was filed by a former employee who had been let go); *id.* (R. Gross) (describing the suit to Ms. Gross and stating that it was filed by Ms. Potts "two months after we let her go").)  Furthermore, Mr. LeMay tells class members that the claims in the suit are meritless and that he has documentation definitively showing that both the named plaintiffs and other class members were paid correctly.  (*Id.* (G. Lilly) (telling Mr. Lilly that he has W2's for everyone, including Mr. Lilly); *id.* (R. Gross) (stating that he has "everything in line" to show that Ms. Potts was paid correctly); *id.* (U. Holt) (informing Ms. Holt that, based on NL&T's records, no one was ever paid less than minimum wage and that the claims are "just not true").)  It does not appear from the recordings, however, that Mr. LeMay ever showed, or even offered to show, the class members the documents that he claimed demonstrated they were paid correctly.  Finally, in the recordings, Mr. LeMay completely neglects to inform class members that they could be entitled to liquidated damages in the amount of their unpaid wages and attorney's fees under the FLSA.

When Mr. LeMay did attempt to describe the plaintiffs' claims to class members, he made inaccurate and misleading statements about the allegations and omitted relevant information regarding the class members' available recovery.  For example, in the recordings, Mr. LeMay describes the suit as falsely alleging that the class members were "1099" employees, meaning that NL&T did not withhold taxes from their checks.  (*Id.* (G. Lilly) (telling Mr. Lilly that Ms. Potts has claimed that she was a 1099 employee, "which is just not true"); *id.* (R. Gross) (representing to Ms. Gross that "[t]he lawsuit states that you are a 1099 employee").)  Not only does the Complaint contain no mention of the 1099 classification, but it also contains no allegation that NL&T failed to correctly withhold taxes from its employees' checks.  (*See* Docket No. 22.)  In the recordings, Mr. LeMay also references an allegation in the Complaint that the

plaintiffs' average work week was 60 to 65 hours (*id.* ¶ 49) and discusses this allegation in such a way that the class members – who have likely only seen the Notice – might believe that they could not recover unpaid wages in this suit *unless* they worked 60 to 65 hours a week (*see* Docket No. 87 (R. Gross) (Mr. LeMay fails to correct Ms. Gross's apparently mistaken belief that she can recover overtime only if she worked over 60 hours a week);[8] *see also id.* (G. Lilly) (stating that the claims in the lawsuit are "1099, over 60 hours a week, weren't paid adequately," and then erroneously telling Mr. Lilly that those claims were stated in the Notice).) Mr. LeMay also omits relevant information regarding the potential value of the class members' claims in his conversations with them, failing to tell them that they could recover liquidated damages in the amount of their unpaid wages, as well as attorney's fees, if they are successful in the suit.

Finally, despite Mr. LeMay's assertion that he gave class members the opportunity to take time to review the documentation and to call counsel for the plaintiffs to discuss the release, the record contains no evidence demonstrating that he ever *told* the settling class members that they had such an opportunity. In the recordings, Mr. LeMay never informs class members that they can take time to consider his offer or review the documentation, and Mr. LeMay admitted during the hearing that he cannot recall telling any class member that they could. Furthermore, the recordings reflect that Mr. LeMay told only Ulina Holt – the only class member who chose not to settle with him – that she could contact counsel for the plaintiffs to discuss the proposed agreement. (*Id.* (U. Holt) ("I don't have an attorney here. . . . You can call them. You can have

---

[8] The court notes that Mr. LeMay never represents to Ms. Gross *during the recording* that she can only recover unpaid wages if she worked over 60 hours. (Docket No. 87 (R. Gross).) The recording appears to be incomplete, however, and Ms. Gross protests that she didn't work 60 hours a week, despite apparently never having seen the Complaint, signifying that she likely heard from Mr. LeMay that this was a significant threshhold in an earlier portion of the conversation that was not recorded.

an attorney. . . . It's your choice.").)  Moreover, when Mr. LeMay informed Ms. Holt of her right

to an attorney, he also undermined that information by making statements that implicitly

discouraged Ms. Holt from contacting counsel for the plaintiffs.  (*Id.* (U. Holt) (representing that

"the attorneys don't care" and that they send out notices saying "there's a pot of gold at the end

of this").)

### B.    Settlement Discussions Between Mr. McMurtry and Class Members

Mr. McMurtry obtained release agreements from nine class members – Michael Boyd,

Ronnie Chrismon, Dwight James, Marcus McCarroll, Kenneth Neal, Benjamin Ramos, Efrain

Ramos, John Thomas, and Christa Webster – and unsuccessfully attempted to settle the claims of

named plaintiff Kimberly Hunt.[9]  Mr. McMurtry testified that, although he maintains that he is

not liable for any of the plaintiffs' claims because all class members were properly paid under

the FLSA, he chose to settle with class members because he wished to avoid the nuisance of

defending against their claims in this proceeding.

Mr. McMurtry submitted audio and video recordings of portions of his discussions with

Ms. Chrismon, Mr. McCarroll, Mr. Neal, Benjamin and Efrain Ramos, Mr. Thomas, and Ms.

Webster.  (Docket No. 88.)  Mr. McMurtry testified that he has submitted all of the recordings

that he has in his possession,[10] and it appears that many of the recordings contain *entire*

---

[9] Ms. Potts also claims that Mr. McMurtry contacted her in an unsuccessful attempt to
settle her claims (Docket No. 76-8 (Decl. D. Potts)), but Mr. McMurtry flatly denies that he ever
attempted to contact her (Docket No. 82-1 ¶ 16 (Aff. T. McMurtry)).  The court need not resolve
this dispute in order to rule on the pending motion, however, as Mr. McMurtry's discussions
with other class members provide ample evidence to support the court's decision.

[10] Ms. Miles, who accompanied Mr. McMurtry when he spoke with class members,
testified that they both she and Mr. McMurtry recorded the discussions with class members, but
the record contains only one recording for each class member.  The parties never explained what,
if anything, happened to these second recordings, or if they even still exist.

settlement conversations between Mr. McMurtry and a class member. (*But see* Docket 88 (C. Webster) (recording a second meeting between Ms. Miles and Ms. Webster, in which Ms. Webster signs the release agreement and accompanying documentation, but failing to capture the first meeting between Ms. Webster and Mr. McMurtry where the possibility of settlement was discussed).) These recordings, along with the documentary evidence in the record and the testimony presented at the hearing, demonstrate that Mr. McMurtry described the potential value of the plaintiffs' claims to class members in an inaccurate and misleading manner, described the legal effect of the release agreements and affidavits to class members in a misleading manner, and did not adequately inform class members of their right to speak to their own counsel before releasing their claims.

      Mr. McMurtry contacted each of the class members he spoke with shortly before the holidays, and he came to each of the meetings with the class members – many of whom Mr. McMurtry claims made less than $10,000 per year while working for NL&T – with cash in hand. With some class members, Mr. McMurtry called ahead to schedule a meeting (*see* Docket No. 76-7 (Decl. K. Hunt) ¶ 4; Docket No. 88 (B. Ramos)) and, with other class members, Mr. McMurtry showed up, unannounced, at their homes (*see* Docket No. 88 (R. Chrismon); *id.* (M. McCarroll); *id.* (J. Thomas)). At every meeting, Mr. McMurtry had brought enough money, in cash, to pay the class member the agreed upon amount for their release of their claims. (*See, e.g.*, *id.* (R. Chrismon); *id.* (B. Ramos).) Often, Mr. McMurtry even told the class member that, if they would sign the release agreement and opt out of the lawsuit, he would pay them immediately in cash. (*Id.* (R. Chrismon) (telling her that, if she thinks his offer is fair, he will give her "two hundred dollars cash"); *id.* (M. McCarroll) (telling Mr. McCarroll that "I pay cash"); *id.* (B. Ramos) (telling Benjamin Ramos that he will be receiving "four hundred dollars

cash"); *id.* (J. Thomas) (offering to pay Mr. Thomas "cash money" so that Mr. McMurtry does

not have to pay attorneys and Mr. Thomas does not have to go to court).)

During the discussions, and in an apparent attempt to minimize his perceived liability,

Mr. McMurtry described the value of class members' claims in a misleading way and omitted

pertinent information regarding the damages to which class members may be entitled and how

those damages would be calculated. At the beginning of most of the recorded discussions,

Mr. McMurtry primes the class members to believe that they could only recover a few hundred

dollars, by comparing this suit to a previous FLSA suit against NL&T, *Coats v. Nashville Limo

Bus, LLC*, No. 3:10-cv-00759 (M.D. Tenn. closed Mar. 1, 2012). Mr. McMurtry describes the

*Coats* suit as "very similar" to the current suit (*see, e.g.*, Docket No. 88 (R. Chrismon)), and

impresses upon class members that the plaintiffs in the prior suit recovered only $100 to $400

each. (*Id.* (R. Chrismon) (telling Ms. Chrismon that the most any class member had recovered

was $414); *accord id.* (M. McCarroll) (describing the prior suit as a "similar situation" and

stating that class members were paid between $100 and $400); *id.* (E. Ramos) (telling Efrain

Ramos that the "highest person" in the last suit only received $400); *id.* (J. Thomas) (same).)

The plaintiffs' allegations in *Coats* were not, however, "very similar" to the allegations

being made now. Though the *Coats* suit did allege that NL&T failed to pay the plaintiffs

minimum and overtime wages as required under the FLSA, the gravamen of the *Coats* complaint

was that (1) NL&T had been improperly classifying the plaintiffs as 1099 independent

contractors for whom taxes did not have to be withheld and (2) the management of NL&T had

retaliated against Mr. and Mrs. Coats for requesting a determination of their employment status

from the Internal Revenue Service. Complaint, *Coats*, No. 3:10-cv-00759 (M.D. Tenn. Aug. 12,

2010). Moreover, Mr. McMurtry never tells class members that, because the amounts received

by class members in the prior suit were the result of a settlement agreement, Order, *Coats*, No. 3:10-cv-00759 (M.D. Tenn. July 12, 2011), they do not necessarily reflect the amount class members could have won had they successfully pursued their claims to verdict. In this way, Mr. McMurtry attempts to mislead current class members regarding the value of their claims.

While speaking with class members regarding the worth of their claims, Mr. McMurtry also omits highly relevant information regarding damages and recovery under the FLSA. First, Mr. McMurtry never informs class members that they may be entitled to liquidated damages, which would effectively double their recovery for unpaid minimum or overtime wages. Second, Mr. McMurtry never tells class members that, should they be successful in their claims, attorney's fees would be awarded in addition to their recovery for unpaid wages. Rather, Mr. McMurtry tells them that, even though class members in the *Coats* suit received only hundreds, the  lawyers earned "thousands," and he even goes so far as to tell one class member that counsel for the plaintiffs will get a percentage of any amount the class members are awarded. (Docket No. 88 (R. Chrismon) (telling Ms. Chrismon that class members only received a couple hundred dollars, "but the lawyers got thousands, you know what I'm saying?"); *id.* (M. McCarroll) ("[T]he people in the class action lawsuit get hundreds of dollars and then [the attorneys] end up getting thousands."); *id.* (K. Neal) (confirming to Mr. Neal that counsel for the plaintiffs would get "a percentage" of the plaintiffs' final award); *id.* (J. Thomas) (telling Mr. Thomas that class members in the prior suit got "a hundred bucks, and that was it . . . and the lawyers got thousands").) This failure to accurately discuss liquidated damages and attorney's fees makes any discussion of the class members' likely recovery inherently misleading.

Mr. McMurtry's most misleading tactic, however, was his attempt to minimize his perceived liability for the plaintiffs' claims by telling class members that he was only liable for

unpaid wages from August of 2012 to March 1, 2013, when the business was transferred to

Mr. LeMay. (Docket No. 88 (R. Chrismon) (telling Ms. Chrismon that he was only responsible

"for the months of August, September, October, November, and December" in 2012); *id.*

(M. McCarroll) (telling Mr. McCarroll he was only liable for unpaid wages from August 2012 to

March 2013).) By telling class members that he was only liable for the time period up to March

1, 2013 – when ownership of NL&T transferred to Mr. LeMay – Mr. McMurtry misled class

members regarding the scope of the release agreements they signed.[11] Mr. McMurtry

affirmatively stated to some class members that they were only settling with *him*, and he told

many other class members that Mr. LeMay may approach them to discuss a separate release of

the claims against Mr. LeMay. (Docket No. 88 (M. McCarroll) (telling Mr. McCarroll, "you're

only settling with [Mr. McMurtry]," and that Mr. LeMay may also want to settle with him); *id.*

(B. Ramos) ("Josh, the guy I sold it to, he may want to do the same thing with you."); *id.* (E.

Ramos) (telling Efrain Ramos that Mr. LeMay may want to "do the same thing" and give

Mr. Ramos "a little money").) The release agreements, however, purport to release *all* claims

against both Mr. McMurtry and Mr. LeMay, stating that the class member "releases and forever

discharges . . . *any present or former owners*, agents, employees, officers, directors, consultants,

or successors of [NL&T]." (*See, e.g.*, Docket No. 82-2 (Combined Settlement Documents),

p. 2.) Mr. McMurtry also had class members sign opt out statements that would remove them

from the suit in its entirety, not just from the claims against Mr. McMurtry himself.

Mr. McMurtry thereby misled class members into releasing *all* of their claims against the

---

[11] Mr. McMurtry did not always explicitly tell class members that he was only liable for
the time period up to March 1, 2013 but, as noted above, he often implied it by telling class
members that Mr. LeMay may approach them to obtain a separate release of the claims against
him.

defendants while still representing to them that they would have the opportunity to settle the remainder of their claims with Mr. LeMay. With the exception of Mr. James, the first class member to release his claims, it does not appear that Mr. LeMay ever approached the class members who had worked for both him and Mr. McMurtry to settle these remaining claims or that he ever intended to do so.

Mr. McMurtry argues that there was nothing misleading about the overall discussions because he told every class member to read the documents that they signed and he offered to answer any questions that they had. The recordings make clear, however, that few of the class members fully read the documents and that, when they did, they often read only the release agreement. (Docket No. 88 (R. Chrismon) (showing Ms. Chrismon reading the first page of the release agreement, but not the second page of the agreement or the affidavit); *id.* (M. McCarroll) (showing only 30 seconds of time elapsing between Mr. McCarroll being given the documents and beginning to sign them).) Often, when it appears that the class member has not fully read the documentation, Mr. McMurtry compounds the problem by inaccurately or incompletely describing the contents of the documents to the class member. (*Id.* (R. Chrismon) (telling Ms. Chrismon that the affidavit is the "same thing" as the release agreement and that it says that she is "voluntarily signing" the agreement, but not telling her what the other paragraphs in the affidavit state); *id.* (M. McCarroll) (telling Mr. McCarroll that the affidavit says that he was "fairly compensated," but not clarifying that he means fairly compensated while working at NL&T rather than fairly compensated by the payment Mr. McCarroll receives for releasing his claims).)

Additionally, while it is true that Mr. McMurtry told class members to ask him any questions they had about the documents, the testimony at the hearing revealed that it is equally

true that he would have been unable to accurately or completely answer their questions. For example, although Mr. McMurtry testified that he was familiar with the FLSA (and represented himself to class members as such), he could not accurately describe the damages available to plaintiffs under the FLSA. When asked to describe liquidated damages and how they are calculated, Mr. McMurtry testified that (1) liquidated damages occur when an employee is not paid correctly, and (2) he would never need to calculate liquidated damages because he never violated the FLSA. Mr. McMurtry was similarly unable to adequately explain the liquidated damages provision found in the release agreements. During the hearing, and despite the fact that the liquidated damages provision applies only to a breach of the confidentiality agreement, Mr. McMurtry expressed his belief that he could enforce that provision against any class member who breached the agreement as a whole, including by remaining in the lawsuit. It is clear, therefore, that, even if class members had asked questions before signing the release agreements and affidavits, they would not have received accurate or complete answers.

Finally, although Mr. McMurtry testified that he tried to make sure that he told every class member that they had the right to consult with an attorney regarding the proposed settlement, the recordings reveal that he rarely did. (*See, e.g.*, Docket No. 88 (R. Chrismon) (telling Ms. Chrismon that they can speak without attorneys, but never telling her that she is entitled to contact her own attorney regarding the proposed agreement); *but see id.* (M. McCarroll) (telling Mr. McCarroll that they can talk without attorneys, but if Mr. McCarroll wants to speak to his attorney, "[he's] welcome to get him"); *id.* (B. Ramos) (telling Benjamin Ramos that he is "welcome" to an attorney if he wants one).) When Mr. McMurtry *did* inform a class member of his right to an attorney, he also made statements implicitly discouraging class members from contacting counsel for the plaintiffs, even going so far as to say that he knows

"how [attorneys] mislead everybody." (*Id.* (M. McCarroll) (telling Mr. McCarroll that he "can't

stand" attorneys because he knows "how they mislead everybody" and get "thousands" of dollars

when the class members only get "hundreds"); *id.* (B. Ramos) (telling Benjamin Ramos he wants

to settle because counsel for the plaintiffs is "trying to say we owe him a lot of money already");

*see also id.* (R. Chrismon) (telling Ms. Chrismon that, in past FLSA suits against him, the

attorneys were "the only ones that made any money" and that counsel for the plaintiffs resisted

changes to the Notice that would have made it easier for potential class members to understand).)

## III.     Discussions Between Mr. James and Mr. McMurtry Immediately Preceding the Evidentiary Hearing

In their Responses in opposition to the Motion, the defendants maintain that they only

contacted class members after they had learned that some class members "were unaware of their

role in the litigation or otherwise desired to opt-out of the lawsuit." (Docket No. 81, p. 3

(LeMay); *accord* Docket No. 82, p. 5 (McMurtry).) Specifically, both individual defendants

aver – Mr. LeMay in an affidavit and Mr. McMurtry in his testimony at the hearing – that

Mr. McMurtry was approached by Dwight James (and not the other way around) and that Mr.

James informed Mr. McMurtry that he did not wish to be a party to the litigation. (*See* Docket

No. 81-1 (Aff. J. LeMay) ¶ 4.) Mr. McMurtry testified that, as a result of speaking with

Mr. James and obtaining a release of his claims, Mr. McMurtry then decided to try to settle the

claims against him with all of his former employees who had chosen to join the suit.

Even though he was called by the plaintiffs at the hearing, Mr. James confirmed the

defendants' version of events, testifying that *he* approached *Mr. McMurtry* and requested

removal from the suit, and not the other way around. The court has reason, however, to be

suspicious of Mr. James' testimony. The court found Mr. James to be evasive and untrustworthy

on the stand, with his answers to questions from counsel for the plaintiffs changing from one

minute to the next, to the point that the court cannot tell which portions of his contradictory testimony are true and which are not. Adding to Mr. James' untrustworthiness is the undisputed fact that he has been in direct contact with Mr. McMurtry on multiple occasions between September of 2015, when Mr. James agreed to release his claims against the defendants, and the evidentiary hearing on March 31, 2016. Mr. McMurtry himself testified that he spoke to Mr. James on the phone less than a half an hour before the evidentiary hearing began.

The mere fact that a witness for the plaintiffs, and a class member to boot, was in direct contact with one of the defendants mere moments before the evidentiary hearing is, on its own, troubling. This fact moves beyond being merely troubling, however, in light of the testimony of Mr. McCarroll and Ms. Hunt – two other witnesses for the plaintiffs – that Mr. James had told them that Mr. McMurtry was compensating him – with a new car battery and money – for his testimony at the hearing. The court finds this testimony from Mr. McCarroll and Ms. Hunt to be particularly credible because both witnesses independently and consistently testified as to what Mr. James had told them.

Based on this testimony, Mr. James' contact with Mr. McMurtry immediately prior to the hearing, and Mr. James' general lack of reliability on the stand, the court finds that Mr. James' testimony is not credible, and it will disregard it as such. Ultimately, however, the harm done by Mr. James is inconsequential, as the main thrust of his testimony – that he approached Mr. McMurtry because he did not want to participate in the suit – is ultimately immaterial to the question of whether the defendants engaged in coercive or misleading tactics during their conversations with other class members.[12]

---

[12] For his part, Mr. McMurtry flatly denied, under oath, that he had offered Mr. James a new car battery or money in exchange for his testimony. Rather, according to Mr. McMurtry, Mr. James had called him shortly before the hearing to say that his car battery – which he had

## <u>ANALYSIS</u>

The plaintiffs contend that the defendants' unilateral communications with class members who they knew to be represented have undermined the court's ability to control the ongoing collective action. Specifically, the plaintiffs argue that the defendants have (1) violated the court-approved Notice by contacting class members and (2) misled and coerced class members in an improper attempt to convince them to abandon the suit. (Docket No. 76, pp. 9–17.) The plaintiffs argue that the court, therefore, should exercise its broad authority in managing § 216(b) actions to remedy the harm done by the defendants' communications with class members. (*Id.*) Additionally, the plaintiffs argue that the release agreements are invalid as a matter of law, because an employee may not settle his claims under the FLSA without the supervision of the Secretary of Labor or a district court. (*Id.* at p. 17.)

## I.   <u>Tennessee Law</u>

Although the defendants concede that they approached class members and discussed the possibility of a settlement and release with them, it is worth noting that this unilateral communication does not, on its own, demonstrate that the defendants acted improperly. In

---

purchased from the service department at Mr. McMurtry's current business, Franklin Motors – would not start and that Mr. James, therefore, could not make it to the hearing. Mr. McMurtry testified that he told Mr. James that the battery was likely still under warranty and that, if it were, Franklin Motors' service department could replace it for him. While the court has serious questions about the plausibility of Mr. McMurtry's version of his pre-hearing phone call with Mr. James, and despite the suspicious circumstances, the evidence does not support a finding that Mr. McMurtry actually offered to pay Mr. James for his testimony at the hearing. The *only* evidence of Mr. McMurtry's alleged offer to compensate Mr. James for his testimony consists of the statements of Mr. McCarroll and Ms. Hunt that Mr. James told them he had. These hearsay statements, while admissible to demonstrate Mr. James' then-existing state of mind, cannot be accepted for the truth of the matter asserted (i.e., that Mr. McMurtry *did* offer to compensate Mr. James for his testimony). The court cannot, therefore, find that Mr. McMurtry acted illegally with respect to Mr. James, absent additional evidence.

Tennessee, there is no rule that categorically prohibits one party from contacting or communicating with another party. Rule of Professional Conduct 4.2 provides that "a *lawyer* shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter," and Comment 4 to the Rule clarifies that "[p]arties to a matter may communicate directly with each other, and a lawyer is not prohibited from advising a client concerning a communication that the client is legally entitled to make."

Tennessee courts have not addressed how far a lawyer may go in advising or assisting a client who directly contacts an opposing represented party, before crossing the line into impermissible overreaching. A recent ABA opinion on an identically worded model rule suggests that impermissible overreaching occurs when an attorney either (1) "assist[s] the client in securing from the represented person an enforceable obligation," without advising the client to encourage the other party to consult with counsel before entering into the obligation or (2) drafts a proposed agreement for the client and the represented party to sign without including conspicuous language encouraging the other party to consult with counsel. ABA Formal Opinion No. 11-461 (Aug. 4, 2011). Mr. LeMay avers that he did not consult with his counsel before approaching class members, and there is no evidence in the record to the contrary. (*See* Docket 81-1 ¶ 22.) Mr. McMurtry has also sworn that he did not consult with counsel before approaching class members, and he testified that the release agreements and affidavits that he had class members sign were not drafted by his current counsel but, rather, copied from agreements drafted by counsel in the *Coats* suit long before the current action was even filed.

The defendants were not, therefore, prohibited from communicating directly with class members or having them sign the release agreements under Tennessee law, and the communications are not, by the mere fact that they occurred, grounds for invalidating the

releases or granting other relief to the plaintiffs.

## II.    **The Notice**

The plaintiffs also argue that the court-approved Notice, which informed putative class members that they "should not" discuss the case with the defendants without their counsel present, amounted to a court order prohibiting contact between the defendants and class members.  (Docket No. 76, p. 11.)  The Notice does not, however, contain express language prohibiting the defendants from discussing the case with class members, and a review of the briefing and other docket entries regarding conditional class certification and approval of the Notice reveals no statement from the parties or court indicating that the Notice was intended to prohibit the defendants from communicating with potential class members.[13]  On its own, therefore, the Notice does not render the defendants' conduct improper or provide grounds for the court to grant the Motion.

## III.    **The Court's Duty and Authority to Oversee and Control the Class Action**

There is, however, legal authority outside of Tennessee's Rules of Professional Responsibility and the terms of the Notice that provides a basis for the court to grant the Motion and which the court finds ultimately persuasive.  "Because of the potential for abuse [in class actions], a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981). "But this discretion is not unlimited, and indeed is bounded by the relevant provisions of the Federal Rules" of Civil Procedure governing class

---

[13] The plaintiffs' first proposed notice contained no instruction to potential class plaintiffs whatsoever regarding contact with the defendants (Docket No. 46-6 (First Proposed Notice)), and there is nothing in the record indicating why the parties chose to include this language in the final, approved Notice or what they intended the language to mean.

actions, which give the court discretion to "make appropriate orders: . . . imposing conditions on the representative parties or on intervenors . . . [and] dealing with similar procedural matters." *Id.* at 99–100. While this suit was brought pursuant to § 216 of the FLSA rather than Federal Rule of Civil Procedure 23, the same concerns and justifications for judicial oversight apply in both instances, and courts apply the same standards in FLSA class actions as they do in Rule 23 actions. *See Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 171 (1989).

An exercise of discretion limiting the defendants' communications or remedying their effect must be supported by a "clear record and specific findings that reflect a weighing of the need for a limitation and the potential for interference with the rights of the parties." *Gulf Oil*, 452 U.S. at 101. Such a weighing should identify the potential or actual abuses being addressed and "should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances." *Id.* at 101–02, 104 (finding that a serious restraint on expression must be "justified by a likelihood of serious abuses" and could not be supported by the "mere possibility of abuses"). Where communications are misleading, coercive, or an improper attempt to undermine the class action by encouraging class members not to participate in the suit, they may be limited by the court, as long as the order is grounded in good cause and issued with a heightened sensitivity for the First Amendment. *Belt v. Emcare Inc.*, 299 F. Supp. 2d 664, 667–68 (E.D. Tex. 2003); *see also Billingsley v. Citi Trends, Inc.*, 560 F. App'x 914, 922 (11th Cir. 2014) (collecting cases from multiple districts that demonstrate that district courts routinely "exercise discretion to correct the effect of pre-certification communications with potential FLSA collective action members after misleading, coercive, or

improper communications are made").[14]

## A. Mr. LeMay's Conversations with Mr. Chumney Were Coercive.

The potential for coercion is high in unsupervised settlement communications between a defendant and a class member. First, courts have long recognized that a "unilateral communications scheme . . . is rife with potential for coercion," *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1202 (11th Cir. 1985), particularly when class members are contacted directly and in person, *see Camp v. Alexander*, 300 F.R.D. 617, 623 (N.D. Cal. 2014). Second, the potential for coercion and abuse of the class action is especially high when there is an ongoing business relationship between the two parties, particularly when that relationship is one

---

[14] During the evidentiary hearing, counsel for Mr. LeMay attempted to distinguish two cases on which the plaintiffs rely for the proposition that this court has the authority to order remedial action for the defendants' improper communications: *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193 (11th Cir. 1985) and *Belt*, 299 F. Supp. 2d 664. Counsel for Mr. LeMay stated that, in these cases, the courts were justified in remedying the defendants' improper communications with *potential* class members, because they were exercising their authority to supervise the class certification and notice processes. In this way, counsel for Mr. LeMay implied (but never explicitly argued) that, because Mr. LeMay's unsupervised and unilateral communications targeted class members who had *already consented to join the suit*, and because the class certification and notice processes had concluded, this court does not have the authority to order remedial action for any impropriety in those communications.

The court rejects this implication. While *Kleiner* certainly stresses the importance of "the essential supervision of the court" prior to and during class certification, 751 F.2d at 1203, it never states that the district court's duty to protect the integrity of the judicial process ends once a class has been certified. Similarly, while *Belt* concerns itself primarily with the importance of protecting "absent class members," it never implies that the district court's "duty and [] broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties" is confined to any specific point in the class action process, let alone to certification and notification. 299 F. Supp. 2d at 667–68. To the contrary, as both parties have recognized, district courts have significant authority in supervising and enforcing settlements in FLSA class actions (*see* Docket No. 76, pp. 17–20; Docket No. 81, pp. 14–18) which, presumably, encompasses the authority to remedy the effects of improper settlement communications.

of employer to employee.  *See Kleiner*, 751 F.2d at 1202–03; *Camp*, 300 F.R.D. at 622 (citing federal cases from California, Texas, and Georgia, and noting that "[o]ther courts have also noted the potential for coercion in situations where employers contact putative class member employees").

The court concludes that Mr. LeMay's discussions with Mr. Chumney, a current employee of NL&T, were coercive and, therefore, improper.  The evidence clearly demonstrates that Mr. LeMay abused his role as Mr. Chumney's employer by pressuring Mr. Chumney to agree to the terms of the release agreement under threat of reduced hours and, thereby, reduced pay.  The second video recording of Mr. Chumney – submitted only two days before the hearing – clearly shows Mr. Chumney stating that he's "just thankful to have a job," but that "[he] can't convince [Mr. LeMay], so [he's] not working right now," and is "just really trying to keep [his] job."  (Docket No. 105.)  Although Mr. LeMay testified that he never threatened Mr. Chumney's employment, the court does not find his testimony to be credible in light of Mr. Chumney's recorded statements and Mr. LeMay's failure to correct those statements after they were made, which one would expect him to do if they were, as he argues, untrue.  Accordingly, the court concludes that remedial action is both appropriate and necessary to remedy the effects of this coercion.

The court cannot, however, find that there is anything coercive about the communications between the individual defendants and their *former* employees.  The record contains no evidence of any threatening tactic being used during the discussions between the defendants and their former employees.  It is true that Mr. LeMay and Mr. McMurtry unilaterally contacted these class members, with Mr. McMurtry sometimes even showing up at former employees' homes unannounced.  It is also true that the defendants showed up at class members' homes shortly

before the holidays ready to pay cash as soon as class members – who, according to the defendants themselves, made very little while working for NL&T – signed a release agreement. But these tactics, however predatory and distasteful, do not rise to the level of coercion that would justify, as a matter of law, any remedial action taken by this court.

**B.    The Defendants Made Inaccurate and Misleading Statements During Their Discussions with Class Members.**

Even absent a finding of coercion, however, the court may remedy the effects of any communications between the defendants and their former employees if those communications were misleading.  A defendant is allowed to engage in "self-serving advocacy" so long as the statements are not inaccurate or misleading.  *See Keystone Tobacco Co., Inc. v. U.S. Tobacco Co.*, 238 F. Supp. 2d 151, 157 (D.D.C. 2002).  This self-serving advocacy does not, however, allow a defendant to "mislead[] . . . class members about the strength and extent of their claims and the alternatives for obtaining satisfaction of those claims."  *Id.* at 155 (quoting *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1139 (7th Cir. 1979)); *accord Camp*, 300 F.R.D. at 624–25 (invalidating signed opt-out declarations where a letter sent to putative § 216 class members omitted relevant information regarding the plaintiffs' claims, presented an "entirely one-sided" view of the case, failed to provide contact information for the plaintiffs' counsel, and, therefore, was misleading).  Defendants may not omit details or fail to provide relevant information regarding the plaintiffs' claims when communicating with class members, and courts have found settlement communications to be misleading when they fail to explain the plaintiffs' claims, do not append the plaintiffs' complaint to a settlement offer, or fail to provide contact information for the plaintiffs' counsel.  *See, e.g.*, *Camp*, 300 F.R.D. at 624–25; *Keystone Tobacco Co.*, 238 F. Supp. 2d at 155–57.

During the settlement discussions with their former employees, both Mr. LeMay and

Mr. McMurtry crossed the line from engaging in permissible self-serving advocacy by making multiple inaccurate and misleading statements – and omitting pertinent information – regarding the strength and extent of the plaintiffs' claims, the legal effect of the release agreements and affidavits, and class members' right to discuss the proposed settlement with counsel for the plaintiffs. Numerous specific misleading and inaccurate statements and omissions of pertinent fact have already been outlined in the court's findings of fact, and the court will not restate them all here. It suffices to say that it is clear that Mr. LeMay presented an entirely one-sided – and often flatly inaccurate – view of the plaintiffs' claims to class members. Mr. LeMay did not provide class members with a copy of the Complaint, he did not offer to show them the documentation of hours worked that he claimed demonstrated that the allegations are meritless, and he did not inform them that they could be entitled to liquidated damages and attorney's fees in addition to recovering any unpaid wages. He never informed class members that they could request time to review the release documentation, and he told only one class member – who ultimately chose *not* to release her claims – that she could contact counsel for the plaintiffs to discuss the proposed agreement.

The evidence in the record and presented at the hearing reflects that Mr. McMurtry made similarly misleading and inaccurate statements, and omissions of relevant information, in his discussions with class members. Mr. McMurtry attempted to minimize his perceived liability by (1) comparing the current suit to a prior FLSA suit against NL&T without providing class members with the information necessary to evaluate the value of that comparison, and (2) failing to inform class members that they could be entitled to liquidated damages and attorney's fees in addition to any unpaid wages. Furthermore, Mr. McMurtry misled class members regarding the scope of the releases they signed, telling class members that they could also settle with Mr.

LeMay while having them sign agreements that purport to release their claims against *all* defendants. And while it is true that Mr. McMurtry told class members to read the documents they signed and to ask any questions, it is equally true that many of the class members did not fully read the documents before signing them and that Mr. McMurtry could not have accurately or impartially answered their questions, even if they had asked them. Finally, Mr. McMurtry rarely informed class members that they had a right to speak to an attorney about the proposed release and, when he did, he implicitly discouraged the class members from contacting counsel for the plaintiffs, once even going so far as to say that attorneys "mislead everybody." (Docket No. 88 (M. McCarroll).)[15]

The defendants' repeated omissions and misleading and inaccurate statements are exactly the kind of communications that "pose a serious threat to the fairness of the litigation process, the adequacy of representation and the administration of justice generally." *In re School Asbestos Litig.*, 842 F.2d 671, 680 (3d Cir. 1988) (citing *Gulf Oil*, 452 U.S. at 101 n.2). Accordingly, the court concludes that remedial action is both appropriate and necessary to address the harm done by the defendants' improper communications with class members.

## IV.    Court Oversight of Settlements Under the FLSA

As a final matter, and in response to considerable argument between the parties in the briefings and during the hearing, the court notes that, even if the release agreements were not procured by coercion or misrepresentation, they may still be invalid as a matter of law. The

---

[15] These findings of fact were based on the record and the testimony presented at the evidentiary hearing, but the court is aware that no recorded discussions exist for some settling class members and that only partially recorded discussions exist for others. The court is confident, however, that equally serious abuses probably took place in the discussions that were insufficiently documented, due to the sheer volume of misleading and inaccurate statements appearing over and over again in the recorded conversations that *have* been submitted into the record.

plaintiffs have argued that the release forms signed by the settling class members are invalid because (1) as a matter of law, putative class members could not waive their rights to minimum wages, overtime, or liquidated damages under the FLSA, *see Brooklyn Savings Bank v. O'Neill*, 324 U.S. 697, 707 (1945), and (2) settlements under the FLSA must be supervised by the Secretary of Labor or a district court, *see Crawford v. Lexington-Fayette Urban Cnty. Govt.*, No. 06-299, 2008 WL 4724499, at *3 (E.D. Ky. Oct. 23, 2008) (citing *Lynn's Food Stores v. U.S.*, 679 F.2d 1350 (11th Cir. 1982)).  The Sixth Circuit has not issued any recent opinion addressing private settlement or waiver of FLSA claims, but it appears that a class member may waive or settle his FLSA claims so long as the settlement is the result of a compromise of a *bona fide* factual dispute (such as the number of overtime hours actually worked) and not the result of compromise of a legal dispute (such as whether the employee is entitled to overtime pay at all). *See, e.g.*, *Runyan v. Nat'l Cash Register Corp.*, 787 F.2d 1039, 1041–43 (6th Cir. 1986).  It also appears that, contrary to the plaintiffs' argument, some courts allow private, unsupervised settlements of FLSA claims, so long as they are based on *bona fide* disputes over hours worked or compensation owed.  *See Bodle v. TXL Mortg. Corp.*, 788 F.3d 159, 165 (5th Cir. 2015).

Mr. LeMay and Mr. McMurtry have consistently maintained – in their filings and their testimony at the evidentiary hearing – that they are not "liable" for any unpaid wages under the FLSA and that the plaintiffs have no viable claims against them, but they have never clarified the basis for those positions.  (*See, e.g.*, Docket No. 82-1 ¶ 2 (Aff. T. McMurtry) ("A bona fide dispute exists in this case regarding liability under the FLSA."))  The court cannot, therefore, determine whether the release agreements were the result of a compromise of a *bona fide* factual dispute, which would be permissible, or of a legal dispute, which would not.  The court need not reach this question, however, because – as discussed above – the court has concluded that the

release agreement signed by Mr. Chumney was procured by coercion and the release agreements signed by the other settling class members were procured by misrepresentations. The release agreements may, therefore, be invalidated on those grounds. *See Woods v. RHA/Tenn. Grp. Homes, Inc.*, 803 F. Supp. 2d 789, 800 (M.D. Tenn. 2011).

## **RELIEF**

As discussed above, the record clearly demonstrates that the defendants committed serious abuses of the collective action process by coercing Mr. Chumney and misleading the other settling class members into releasing their claims and opting out of the suit. The court must now, therefore, determine what remedial action is appropriate, taking care to exercise its discretion in a way that "limits speech as little as possible." *Gulf Oil*, 452 U.S. at 101–02.

First, in light of the coercive and misleading nature of the defendants' prior communications with class members, the court finds no reason to disturb the previously agreed-upon protective order, which forbids the defendants from "initiat[ing] any communications with named Plaintiffs, any class member, or putative Plaintiffs regarding the subject matter of this litigation until further Order of this Court." (Docket No. 74.)

Second, the court will invalidate the release agreements signed by the settling class members and all accompanying documentation, including signed affidavits and statements opting out of the suit. The court will invalidate only those release agreements that are currently in the record. To the extent that the plaintiffs later learn of opt-in or potential class members who signed release agreements with the defendants, but whose settlement documentation was not placed into the record by the defendants, the plaintiffs may move for invalidation of those agreements and other appropriate remedial action.

The court is sensitive to the possibility that the settling class members may no longer

have the money that was paid to them by the defendants, and the court will therefore order that the settling class members may keep the payment that they have already received and that the defendants will obtain an offset of that amount if liability is determined later in the litigation. If the defendants are determined not to be liable, or if the amount the settling class member received in consideration for the release agreement is greater than the amount for which the defendants are ultimately found to be liable, the court will determine at that time the difficult issue of whether the employees are required to repay the settlement amount. The plaintiffs will submit, and the defendants will be given the opportunity to respond to, a proposed agreed form of notice to go to all current class members concerning the defendants' communications with class members and the invalidation of the release agreements.

With respect to potential class members, the court remains troubled by the relatively small number of current NL&T employees who opted into the suit and the clear evidence of Mr. LeMay's attempted retaliation against Mr. Chumney if he remained a claimant in the case. Mr. Chumney went so far as to defy a subpoena to avoid testifying at the evidentiary hearing. Mr. LeMay testified that he never discouraged NL&T employees from joining the suit, but word could easily have spread at NL&T that Mr. Chumney's hours were cut after he consented to join the suit. The court, therefore, finds it appropriate to reopen the notice period to potential class members who were employed at NL&T from the issuance of the Notice on August 13, 2015 to the present and to toll the statute of limitations for their claims. To that end, the plaintiffs will submit, and the defendants will be given the opportunity to respond to, a proposed agreed form of notice to be posted in a conspicuous place in NL&T's business office and to go to all potential class members who worked at NL&T at any point between the date on which the Notice was issued – August 13, 2015 – and the date on which the accompanying Order issues. This

proposed notice shall concern the impropriety of Mr. LeMay's retaliation against Mr. Chumney, the invalidation of Mr. Chumney's release agreement, and the reopening of the notice period.

Finally, because it does not appear that the defendants have provided the documentation directly to the plaintiffs, the court will order that the defendants produce to the plaintiffs copies of any release agreement and accompanying documentation that was signed by any actual or potential class member that has not heretofore been furnished to the plaintiffs.

The court will not, however, grant the plaintiffs' request that the court require the defendants to pay reasonable attorney's fees and costs for this Motion. The plaintiffs will have the opportunity to recover such costs if they are ultimately successful in this proceeding.

## CONCLUSION

For the reasons discussed herein, the plaintiffs' Motion to Re-Open the Notice Period and to Invalidate Releases will be granted in part and denied in part. The court will invalidate the releases and accompanying documentation, reopen the notice period to certain potential class members, toll the statute of limitations with regard to those potential class members' claims, and order the defendants to produce to the plaintiffs copies of any release agreement that was signed by any actual or potential class member not previously produced. The court will not, however, grant the plaintiffs' request that it require the defendants to pay reasonable attorney's fees and costs for the Motion at this time.

The Order filed in this case at Docket No. 112 stands.

ALETA A. TRAUGER
United States District Judge

38